A11A1281. IN THE INTEREST OF A. B., a child.
(716 SE2d 755)

MILLER, Presiding Judge.

Following a mother's written consent to termination of her parental rights, a juvenile court terminated the mother's parental rights with respect to her child, A. B. We granted the mother's application for discretionary review, and she appeals the juvenile court's order. In two enumerations of error, the mother contends that her consent to the termination was not knowing and voluntary and that the discretionary appeal procedure set forth in OCGA § 5-6-35 (a) (12) denies due process under the State and Federal Constitutions. Finding that both claims lack merit, we affirm the juvenile court's termination of parental rights.

> In considering the mother's appeal, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the mother's right to custody should have been terminated. We neither weigh the evidence nor determine the credibility of any witnesses, but instead defer to the juvenile court's findings of fact.

*In the Interest of K. N.*, 272 Ga. App. 45 (611 SE2d 713) (2005).
So viewed, the evidence shows that the mother gave birth to A. B.

on November 28, 2006.[1] The mother was 17, and in the custody of the Baldwin County Department of Family and Children Services ("Baldwin DFACS"), at the time of A. B.'s birth.[2] Accordingly, Baldwin DFACS also took custody of A. B. when she was born. On December 7, 2006, Baldwin DFACS filed a petition for deprivation. Following a hearing on the petition, the juvenile court entered a temporary custody order, finding that A. B. was a deprived child within the meaning of OCGA § 15-11-2[3] and placing A. B. in the custody of Baldwin DFACS for a period of 12 months. While she was in the custody of Baldwin DFACS, A. B. continued to reside with the mother. On March 12, 2009, the mother gave birth to another child, S. B.[4] S. B. was also placed in Baldwin DFACS's custody and resided in a foster home with the mother and A. B.

As early as January 2007, in a family and child assessment, the mother described A. B. as "odd-looking" and "different, when she's crying she doesn't scream." A. B. was eventually diagnosed with expressive language disorder and received speech therapy. Upon increased observations of other behavioral problems exhibited by A. B., such as banging her head on the wall, running into things, and overall hyperactivity, A. B. was referred for further evaluation. On June 24, 2009, A. B. was evaluated by a family practice physician, who diagnosed A. B. with ADHD and "questionable autism" and recommended that she undergo further psychiatric evaluation for confirmation.

On September 10, 2009, the mother submitted a voluntary surrender of her parental rights and was removed from the foster home in which she had been residing with A. B. and S. B. Although the mother withdrew her surrender on September 14, 2009, she was not able to return to her children's foster home because Baldwin DFACS was already in the process of filing its petition for termination of the mother's parental rights.

Baldwin DFACS filed its petition on October 15, 2009, seeking to terminate the mother's parental rights with respect to both A. B. and S. B. A termination hearing was scheduled for December 29, 2009, at which the mother, along with her attorney, appeared. Before a full hearing ensued, however, the mother agreed to sign and acknowl-

---

[1] According to the family and child assessments, the mother was working as a prostitute when she became pregnant with A. B., and the father of A. B. is unknown.

[2] The mother had been in the custody of Baldwin DFACS since 1991 due to neglect.

[3] In the context of this case, a "deprived child" means a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals . . . ." OCGA § 15-11-2 (8) (A).

[4] The juvenile court found that during her pregnancy with S. B., the mother contracted a sexually transmitted disease and was using drugs.

edge in open court a written consent to the termination of her parental rights as to A. B. As a result, the juvenile court entered an order on January 8, 2010, which was based not only on the mother's voluntary consent to terminate her parental rights of A. B., but also on the stipulations into evidence (to which the parties agreed at the beginning of the termination hearing) of all prior orders and motions relating to both children, case plans and family assessments, psychological evaluations of the mother, and the recommendation of the children's guardian ad litem. With respect to the mother's parenting abilities, the juvenile court's order found that the mother had failed to comply with a case plan that included attending parenting classes/training, participating in her education-college program, attending therapy and substance abuse treatment, complying with the guidelines of foster placement, and meeting the basic needs of A. B. by scheduling and attending medical appointments. The juvenile court's order thus terminated the mother's parental rights as to A. B., but granted the mother an additional six months in which to demonstrate that she was capable of having custody of S. B. returned to her.

On February 6, 2010, the mother filed a motion for new trial, contending that her consent was not voluntary and knowing and was given under duress, and that her attorney was ineffective in advising her of her rights. Following a hearing, the juvenile court denied the mother's motion. In its corresponding order, the juvenile court found that the mother's consent to termination was given voluntarily and knowingly, and that the mother's allegation regarding ineffective counsel was without merit.

1. On appeal, the mother requests that this Court reverse the trial court's order terminating her parental rights. The mother argues that the trial court erred by failing to set aside her consent to the termination of her parental rights "upon learning that it was not knowing and voluntary," due to the fact that "she was falsely convinced that [A. B.] had autism and special needs that she could not handle," and "was given a choice between losing both of her children or losing just one."[5] However, we find no error and, therefore, affirm the trial court's order.

OCGA § 15-11-94 (b) (1) provides that

the court by order may terminate the parental rights of a parent with respect to the parent's child if: (1) [t]he written

---

[5] We note that the mother does not dispute that notwithstanding her consent, clear and convincing evidence exists to justify the termination of her parental rights, and we therefore decline to address such in this appeal. Cf. *In the Interest of T. C. D.*, 281 Ga. App. 517, n. 1 (636 SE2d 704) (2006).

consent of the parent, acknowledged before the court, has been given; provided, however, that acknowledgment before the court is not necessary where the parent . . . voluntarily surrender[s] the child for adoption

as provided by the adoption statutes.

Here, the mother contends that, prior to her decision to sign the written consent, her attorney presented her with essentially two options: (i) proceed with the termination of parental rights hearing, which could result in the loss of her parental rights as to both of her children, or (ii) sign a consent as to A. B., who was assumed to have special needs,[6] and retain her parental rights as to S. B. (for at least six months) while she continued to work on her case plan. The mother chose the latter option, and proceeded to sign a sworn document entitled "Voluntary Consent to Termination of Parental Rights Pursuant to OCGA § 15-11-94 (b) (1)." In the last paragraph of this written consent, the mother certified as follows:

> I have not been subjected to any force, coercion, duress or undue pressure in the execution of this surrender document, that I am not under the influence of any substance that would impair my ability to understand the terms and effect of this document, and that I am signing this document freely and voluntarily in the presence of the Court.

Immediately after she signed the consent, the mother took the stand, was placed under oath, and engaged in the following dialogue with the juvenile court:

> THE COURT: . . . [Y]our attorney has presented this written consent to the termination of your parental rights of [A. B.], date of birth 11/28/2006, sex female. Is that your signature?
>
> [MOTHER]: Yes.
>
> THE COURT: Have you had a chance to discuss this with your attorney . . . ?
>
> [MOTHER]: Yes.
>
> THE COURT: And to be advised of your rights?
>
> [MOTHER]: Uh-huh. (Affirmative)
>
> THE COURT: Do you understand that by signing this consent, and in representing to me that you're consenting

---

[6] On June 24, 2009, A. B. was diagnosed with ADHD and "questionable autism" and was recommended for further psychiatric evaluation for confirmation.

to the termination of your rights, that you will lose all rights to this child?

[MOTHER]: Yes.

THE COURT: Do you know that means that the child could be freed up for adoption? Do you understand that?

[MOTHER]: Uh-huh. (Affirmative)

THE COURT: You may never see the child again, you might, but you may never see the child; do you understand that?

[MOTHER]: Uh-huh. (Affirmative)

Nevertheless, a little over one month after having consented to the termination, the mother filed a motion for new trial, asserting that her consent was not voluntary and knowing, and was made under duress. At the hearing on her motion, however, the mother again testified that she had consented to the termination voluntarily, and that nobody had forced her to sign anything.

In light of the fact that "[t]here is no grace period written into OCGA § 15-11-94 (b) (1) that would allow [the mother] to voluntarily consent to the termination of ... her parental rights, and then withdraw such voluntary consent over one month later,"[7] *In the Interest of T. C. D.*, 281 Ga. App. 517, 518 (636 SE2d 704) (2006), the mother argues that her consent should be set aside because it was procured as a result of fraud and duress. Cf. *In the Interest of B. G. D.*, 224 Ga. App. 124, 127 (2) (479 SE2d 439) (1996) (the ten-day grace period in the adoption statute "did not preclude a surrendering parent from challenging the validity of the surrender based on duress, fraud, incapacity or other grounds which address the voluntariness of the consent, as the statute clearly contemplates a valid, voluntary consent"). Contrary to the mother's arguments otherwise, however, there is no evidence of either fraud or duress invalidating her voluntary consent to terminate her parental rights.

Notably, there is no evidence that fraudulent representations were made regarding A. B.'s health condition in order to induce the mother to sign the written consent. Rather, the evidence shows that the mother was informed by both her foster parent and her caseworker about A. B.'s June 24, 2009 evaluation, where A. B. had been diagnosed with "questionable autism" and recommended to undergo further psychiatric evaluation for confirmation. Further, the mother, relying upon her own observations, had in fact told her attorney that

---

[7] In comparison, the adoption statute expressly allows a ten-day grace period to withdraw a voluntary surrender of parental rights in adoption proceedings. See OCGA § 19-8-9 (b). Since the instant case did not include adoption proceedings, however, this provision is inapplicable here.

she knew A. B. had special needs. Notably, when the mother's attorney offered to review A. B.'s medical records with her (in conjunction with the mother's decision to sign the written consent), the mother declined to do so, explaining "that she'd observed herself at visits that [A. B.] had special needs, and that [her attorney] didn't need to show her anything for her to know that." The mother told her attorney that she felt someone else could better provide for A. B. Thus, rather than await further psychiatric evaluation regarding A. B.'s questionable autism diagnosis, the mother proceeded with the execution of the voluntary written consent based upon her own observations of A. B.'s special needs. The fact that a further psychiatric evaluation determined that A. B. did not have autism is not sufficient evidence of fraud that would invalidate the mother's consent to termination of her parental rights as to A. B. Cf. *In the Interest of K. W.*, 291 Ga. App. 623, 625 (1) (a) (662 SE2d 255) (2008) (finding sufficient evidence of fraud supported trial court's decision to set aside surrender of parental rights for adoption where the mother's DFACS caseworker had a conflict of interest favoring the foster parents, was untruthful, and had engaged in fraud and other illegalities).

Nor is there evidence that the mother's consent to termination was a result of duress. Generally, duress "must consist of threats of bodily or other harm, or other means amounting to coercion, or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." *Mabou v. Eller*, 232 Ga. App. 635, 637 (1) (502 SE2d 760) (1998). Here, the mother admitted that at the time she decided to sign the consent as to A. B., she was aware that if she had instead chosen to proceed with a full termination hearing as to both A. B. and S. B., such hearing would not guarantee the retention of her parental rights as to either child. Although she may have felt pressure at the thought of losing both of her children, such pressure is inherent to, and certainly not unusual of, a termination of parental rights hearing, and it does not amount to legal duress. Cf. id. at 636-637 (1) (finding that the emotional and financial pressures the mother may have been under when she made decision to surrender her parental rights under adoption statute were not unusual under the circumstances and did not amount to legal duress that would permit the mother to withdraw her surrender outside the grace period written into the adoption statute).

Thus, the juvenile court was authorized to find that the mother voluntarily and knowingly consented to the termination of her parental rights. We therefore affirm the juvenile court's order terminating the mother's parental rights to A. B.

2. The mother also argues that the discretionary appeal procedure in OCGA § 5-6-35 (a) (12) violates the due process clauses of

both the Georgia Constitution and the United States Constitution.[8] We disagree.

In the case of *In the Interest of N. A. U. E.*, 287 Ga. 797 (700 SE2d 393) (2010), the Supreme Court of Georgia considered and rejected an identical challenge to OCGA § 5-6-35 (a) (12).[9] The father in that case, like the mother here, claimed that it was a violation of "due process to make appellate review of the juvenile court's determination discretionary and not as of right." Id. In rejecting the father's due process challenge, the Supreme Court found "that if a full and fair trial on the merits is provided, the Due Process Clause of the Fourteenth Amendment does not require a State to provide appellate review, even in termination of parental rights cases." (Citation and punctuation omitted.) Id. The Supreme Court substantiated its ruling by highlighting the absence of a "right to appeal granted by either the State or Federal Constitutions to civil litigants or to the defendant or the State in criminal cases." (Citation and punctuation omitted.) Id.

In support of her claim here, the mother nevertheless argues that this Court should overrule the Supreme Court's ruling in *N. A. U. E.* However, "[t]his we cannot do as we are bound by the decisions of the Supreme Court of Georgia and have no power to overrule or modify them." *Seymour v. State*, 262 Ga. App. 823, 824 (1) (586 SE2d 713) (2003). In accordance with the controlling precedent of *N. A. U. E.*, the discretionary appeal process of OCGA § 5-6-35 (a) (12) does not violate the mother's due process rights under the State and Federal Constitutions. Therefore, her constitutional challenge to OCGA § 5-6-35 (a) (12) is without merit.

*Judgment affirmed. Ellington, C. J., and Doyle, J., concur.*

DECIDED SEPTEMBER 8, 2011 — 

*Good & Lee, Darice M. Good*, for appellant.
*Samuel S. Olens, Attorney General, Shalen S. Nelson, Senior*

---

[8] We note that the mother's constitutional challenge to OCGA § 5-6-35 (a) (12) falls within the limited exception allowing appellate review of an issue that has not been raised and ruled on in the trial court. See *In the Interest of A. C.*, 285 Ga. 829, 832-833 (1) (686 SE2d 635) (2009) ("[The Supreme Court of Georgia] has recognized a limited exception to such general rule in the instance of a challenge to the constitutionality of a statute governing appellate procedure that is necessarily made for the first time on appeal.").

[9] We further note that "[t]he Court of Appeals has jurisdiction when the constitutionality of a state law is questioned if the law has been held to be constitutional against the same attack being made, as such case requires merely an application of unquestioned and unambiguous constitutional provisions." (Citations and punctuation omitted.) *City of Decatur v. DeKalb County*, 284 Ga. 434, 436-437 (2) (668 SE2d 247) (2008).

*Assistant Attorney General, Thomas J. O'Donnell, Assistant Attorney General*, for appellee.