**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**June 13, 2012**

# In the Court of Appeals of Georgia

A12A0431. IN THE INTEREST OF: C. A., a child.                    BO-020

BOGGS, Judge.

Challenging the sufficiency of the evidence, the mother of C. A., a fifteen-month-old girl, appeals from the trial court's order terminating her parental rights. For the reasons explained below, we reverse.

The record before us includes a 66-page transcript from the termination hearing in which only the DFACS caseworker, the mother, and an assistant pastor in the mother's church testified. Although the mother requested that the juvenile court clerk omit nothing from the record, the record before us does not include any case plans nor any of the pleadings or orders from the deprivation proceedings. The only pleadings in the record before us relate to the petition for termination of the mother and father's parental rights.

The record shows that C. A. was born premature (29 weeks gestation) on February 24, 2010. The caseworker testified that DFACS became involved while the child remained in the hospital after "receiv[ing] a report that the mother was acting childlike and she also admitted to having another child taken from her custody." The caseworker agreed that "a term that was previously used in a hearing was schizophrenia" and that "[t]hey said she was acting like that." The caseworker testified that DFACS obtained custody of the child on April 5, 2010 "[d]ue to [the mother] not having any family at the time and also due to the reports of schizophrenia." The caseworker testified that the child was placed in a foster home that has continuously cared for the child and would like to adopt her.

The caseworker testified that DFACS entered into a reunification plan with the mother on April 22, 2010 that required her "to follow all of the recommendations from her mental health provider, complete the parenting classes and maintain stable housing." Her plan also required her to take proper medications and work with a parent aide. The caseworker testified that when the mother learned she was pregnant

again[1] "she had to stop taking her medication, but she did complete her parenting classes."

The caseworker acknowledged that the mother visited her daughter on a regular basis and missed only two visits due to a doctor's appointment and the birth of another child. Despite these regular visits, the caseworker testified that the child was not bonded to the mother and cried during visits. The mother did not pay any child support, but did buy the child a Christmas gift.

According to the caseworker, the mother did not maintain stable housing because she moved six times in one year and was currently living with a boyfriend who has "an extensive criminal history." The caseworker acknowledged during cross-examination that some of the mother's reasons for moving were not unreasonable and that the mother had informed her when she moved.

The caseworker admitted that the mother could "change diapers, cook, look after the child," but explained that there "was a concern that she won't be able to do it independently, that she would need supervision." Based upon a CCFA[2] and the

[1] This child was born on March 7, 2011, and was also taken into DFACS custody and placed in the same foster home as his sister, C. A.

[2] The caseworker testified that CCFA means Comprehensive Child and Family Assessment.

psychological report, the caseworker testified that she did not believe the mother could take care of the child. While the mother completed all of the parenting classes, the caseworker did not believe that the mother completed them successfully based upon information she received from the parenting aide. The caseworker testified that the parenting aide told her that "she didn't think [the mother] could really understand some of the parenting techniques that she taught her."

The caseworker testified that DFACS sought to terminate the mother's parental rights because "[w]e have a psychological that states that she is schizophrenic. We had her working with a parenting aide and they also suggested that she wouldn't be able to effectively care for the child due to her mental health needs. Also an instructor that has been her CCFA has stated the same recommendation." Other than the diagnosis of schizophrenia, the caseworker was not aware of any other physical or mental problems of the mother.

During cross-examination, the caseworker acknowledged that the mother had informed her that she believed she was no longer schizophrenic, that she had been living in a home owned by her church pastor for the past four months, and that she received social security disability payments in the amount of $657 a month.

4

The mother testified that after the birth of her last child in March 2011, she underwent a tubal ligation to prevent additional pregnancies. Following this birth, she sought treatment with a doctor because she knew she needed some help "cause of my stuff." She began taking Risperdal, an anti-psychotic medication, and Trazadone, an anti-depressant medication. The mother explained that she was functioning better with this medication.

The mother testified that medications previously prescribed to her by a different doctor were too strong and caused her to hear voices. According to the mother, this medication resulted in someone saying she had schizophrenia. She stopped hearing voices when she stopped taking the too-powerful medication over a year before the termination hearing. She denied ever experiencing visual hallucinations. She explained that she had been receiving social security disability benefits for about four years based upon a diagnosis of sickle cell anemia and depression, not schizophrenia. She testified that the sickle cell anemia caused her to "get tired and stuff in my legs." She denied that anyone had talked with her about the need to pay child support for her daughter.

She explained that her church is like a second family to her and they are willing to help her with her daughter in ways other than residing with the mother. The

assistant pastor for her church testified that she met the mother two months before the hearing. She explained that the mother and her boyfriend were renting a home owned by the pastor of the church and that the church had provided her assistance with clothing, food, and utilities.

At the conclusion of the hearing, the trial court noted that there was an unappealed order of deprivation and "a longstanding established inability of the mother because of her mental illness to take care of the child. And even though schizophrenia is part of it, there may also be some cognitive intellectual issues as well . . . [A]lthough she seems to be doing better under medication at the moment, the illness is likely to continue and will not likely be remedied."

The trial court subsequently signed an order prepared by DFACS's attorney. Although the certified transcript does not reflect that DFACS introduced any exhibits into evidence, the order states that DFACS introduced into evidence "one exhibit, a Court report marked as 'DFCS #1' with an attached confidential Parenting Assessment that was previously used in court and marked as an Exhibit B. There was also an Exhibit C which was a letter from Jamie J. Ford that was also testified to

6

without objection by the Case Manager. The Court Report, Exhibit B and Exhibit C were submitted as one exhibit by DFCS."[3]

The findings of fact portion of the order states that the "mother has had a previous diagnosis of schizophrenic. . . . There were concerns throughout the history of the case with the mother over her mental ability to care for a child. The psychological report indicated that she could not care for the same." It also states that the mother completed a psychological evaluation which found that the mother was not "fit to care for a newborn child. The parent aide expressed concerns about the mother's ability to parent." The conclusions of law portion of the order states, in part, that "the mother has a verifiable medical deficiency that prohibits her from being able to properly parent or look after this child. The court does not question the fact that the mother does love this child and is not abusive toward the child but because of her mental deficiency, she is not capable of parenting."

---

[3] The record shows that DFACS's attorney submitted exhibits to the juvenile court clerk almost two weeks after the termination hearing and represented that they had been "introduced in court at the termination hearing." These exhibits include a three-page "court report" prepared by the DFACS caseworker; an eight-page parenting assessment prepared by a counselor with a master's degree; and a three-page letter from a licensed marriage and family therapist and master addiction counselor. None of the exhibits have a handwritten date or initials on them, and as previously noted, the transcript contains no indication that they were ever tendered or admitted into evidence at the hearing.

On appeal, the mother contends, in part, that the trial court erred because DFACS failed to prove her mental condition and that it would cause continued deprivation and present unfitness as a parent. We agree.

> We proceed in a termination case with the knowledge that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances. In determining whether to take this drastic step, the juvenile court must find by clear and convincing evidence both that there is parental misconduct or inability and that termination is in the best interest of the child. The first requirement is satisfied when the juvenile court finds that "(1) the child is deprived, (2) the lack of parental care or control is the cause of the deprivation, (3) such lack of care or control is likely to continue, and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child."

(Citations, punctuation, and footnotes omitted.) *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006). When determining whether a child is without proper parental care and control, the juvenile court can consider "[a] *medically verifiable deficiency of the parent's . . . mental or emotional . . . health of such duration or

nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." (Emphasis supplied.) OCGA § 15-11-94 (b) (4) (B) (i).

In this case, the transcript prepared by the certified court reporter does *not* show that the DFACS exhibit referenced in the juvenile court order prepared by DFACS's attorney was admitted into evidence. And, even if it were properly admitted, we cannot consider any hearsay in these exhibits, nor can we consider the diagnostic opinion of a third party not available for cross-examination. See *In the Interest of M. A. C.*, 244 Ga. 645, 655 (4) (261 SE2d 590) (1979), superceded by statute on other grounds as noted in *In the Interest of C. S.*, 282 Ga. 7, 8 (644 SE2d 812) (2007); *In the Interest of C. D. E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001).

Based upon the juvenile court's express reliance upon hearsay in this exhibit to support its conclusion that the mother suffered from schizophrenia to such a degree that she was unable to provide for the needs of her child, we must reverse. *In the Interest f C. D. E.*, supra. 248 Ga. App. at 764-765 (2). This is not a case in which we can affirm the juvenile court's ruling based upon other admissible evidence of the mother's mental condition and its adverse impact on her ability to parent. Compare

9

*In the Interest of D. P.*, 287 Ga. App. 168, 171 (1) (b) (651 SE2d 110) (2007) (parent stipulated to admissibility of psychologist report and other admissible evidence supported trial court's findings). The caseworker's testimony about the mother's mental condition and ability to parent was also based entirely upon the hearsay of third parties who were not available for cross-examination. And, while the mother admitted to some mental issues, her unrefuted testimony that her issues resulted from over-medication and were resolved with different medication precludes a finding, by clear and convincing evidence, that a lack of proper parental care and control is likely to continue. See *In the Interest of K. S.*, 271 Ga. App. 891, 893 (611 SE2d 150) (2005); *In the Interest of A. G. I.*, 246 Ga. App. 85, 87-88 (2) (a) (539 SE2d 584) (2000).

"While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship." (Citation omitted.) *In the Interest of A. A.*, 252 Ga. App. 167, 173 (2) (c) (555 SE2d 827) (2001). When advocating such a drastic step, DFACS must take care to ensure that probative, admissible evidence on the issues presented is properly before the juvenile court.

*Judgment reversed. Doyle, P. J. and Andrews, J., concur.*

10