**SECOND DIVISION**
**BARNES, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 11, 2013**

# In the Court of Appeals of Georgia

A12A2176. IN THE INTEREST OF D. J., a child.

McMILLIAN, Judge.

Following the grant of her application for discretionary appeal, the mother of D. J. appeals the juvenile court's order terminating her parental rights. The mother asserts that the evidence was insufficient to support the court's order. We agree.

"While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship." (Punctuation and footnote omitted.) *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 771 (684 SE2d 29) (2009). And "[t]he right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances." (Punctuation and footnote omitted.) *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006). "As

a result, trial courts apply a heightened standard of proof, the clear and convincing evidence standard" in termination proceedings. (Citations omitted.) *In the Interest of A. R. A. S.*, 278 Ga. App. 608, 609 (1) (629 SE2d 822) (2006). And on appeal, our "standard of review is whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. This Court neither weighs evidence nor determines the credibility of witnesses." (Punctuation and footnotes omitted.) *In the Interest of D. L. T. C.*, 299 Ga. App. at 765.

D. J. was born prematurely on September 11, 2009, and shelter care was authorized for him on September 29, 2009. On October 1, 2009, the Department of Family and Children's Services ("DFCS") filed a deprivation complaint, asserting that the mother was homeless and refused to provide information regarding relatives. The complaint also noted that the mother previously had three other children in DFCS care. DFCS filed a deprivation petition on October 6, 2009, citing the issues raised in the prior filings. The mother stipulated to the allegations of the petition, and the juvenile court issued an order of deprivation and provisional disposition.

DFCS then established a case plan for the mother with the concurrent goals of reunification and placement with a fit and willing relative, with the following goals:

1) the mother must attend and successfully complete a psychological evaluation; 2) the mother must follow the recommendations of that evaluation; 3) the mother must obtain and maintain safe and affordable housing with room enough for D. J.; and 4) the mother must attend and successfully complete all parenting classes. The plan was updated in April 2011 to add a specific requirement that the mother be "assessed by AADD and participate with their recommendations." AADD is identified in the record both as the "Atlanta Alliance on Development Disabilities" and as "All About Developmental Disabilities."

Because the mother's parental rights were terminated based upon a finding that she had failed to comply with these goals, we address the juvenile court's pre-termination findings on this issue in some detail. Following a hearing, the juvenile court signed a final disposition order on January 11, 2010, keeping D. J. in DFCS custody. A review order entered May 19, 2010, continued custody in DFCS because the mother had not completed her case plan goals, but the court found that she had completed parenting classes. Following a permanency hearing, the juvenile court issued an order on August 19, 2010, finding that the mother still lived in transitional housing, visited with D. J. every Monday, participated with her parent aid, and had submitted to a literacy test, which indicated that she reads above a fifth grade level.

3

The order further noted that DFCS was seeking assistance with AADD due to a concern about whether the mother will be able to read D. J.'s prescriptions and provide for the child's special needs. The order also noted that the mother had not completed her case plan goals, but showed "favorable case plan progression." A second permanency order, entered in October 2010, also noted the mother's "favorable progress" on her case plan goals.

A disposition order signed December 8, 2010, found that the mother had substantially complied with her case plan, and the "only hurdle" concerned the referral to AADD, which had not yet contacted the mother, although DFCS had made the referral two months earlier. In addition, the order notes that the mother and the biological father had obtained a one bedroom apartment, that the mother was continuing her Monday visits, and that D. J. recognized her. By the December 10, 2010 review hearing, the mother had a scheduled meeting with AADD and was working with an independent counselor to improve her "coping skills and rational thinking." But at the April 27, 2011 review hearing, an AADD representative testified that the mother had been reluctant to allow AADD to visit her home, and thus AADD had only been able to work with the mother on one occasion. Moreover, the mother

4

was reluctant to take suggestions from AADD, which had a number of resources to help her with her reading skills and with caring for D. J.

DFCS filed a petition to terminate the mother's parental rights on June 9, 2011, based upon an allegation that she had failed to comply with her case plan for a period in excess of one year prior to the filing of the petition. At the June 14, 2011 review, however, the juvenile court found that the mother had been more receptive to suggestions from her AADD providers and was more interactive in playing with D. J. The court also found that the mother could read a prescription bottle and administer the correct dosage, although the AADD worker had not had the opportunity to observe the mother giving medication to D. J. because his caregivers did not bring any medication to the visits. The juvenile court also found that the mother had completed most of her case plan goals, including the parental assessment and psychological evaluation, and she was working on obtaining suitable housing. Moreover, the review order notes that "considering the mother's progress, the Department will reconsider its plan to terminate parental rights."[1] In a subsequent

---

[1] The order also listed the case plan goal solely as reunification. DFCS confirmed the shift in case plan goal in a motion for extension, filed a few months later. But in the juvenile court's order granting the motion, the court lists the plan goal as concurrent: reunification and adoption.

order, in addition to noting the mother's previous case plan progress, the juvenile court found that the mother had completed general parenting classes with AADD. Following a review hearing in September 2011, the juvenile court found that the mother's one bedroom apartment was not sufficient for the child but noted that the mother would be moving into a two bedroom apartment. The juvenile court also found that the mother would not allow AADD into her home for monthly visits and that DFCS had concerns as to whether the mother could administer D. J.'s breathing treatments for his asthma, which was D. J.'s only special need other than a requirement for physical therapy.

The termination hearing was held in January 2012, when D. J. was two years old. The evidence showed that Grady Hospital first contacted DFCS about D. J. because the mother was having trouble understanding why he needed a certain formula and because she had no home to which to take him. DFCS had previous contact with the mother in 2005 concerning her other three children, who were removed from the mother's custody and lived with a legal guardian at the time of the hearing. In compliance with the case plan goals, the mother underwent a psychological evaluation for parental fitness and literacy testing. She was diagnosed with mild mental retardation, depressive disorder and a learning disability. A second

6

psychological evaluation confirmed the diagnosis of mild mental retardation and depressive disorder and recommended family therapy if the mother and all her children were to be reunited.[2] These diagnoses ultimately resulted in her referral to AADD.

The mother completed general parenting classes, but DFCS and AADD also required her to attend specialized classes for parents with developmental disabilities. But the mother was not consistent in attending these classes; she participated in only two classes with AADD between March and November, and thus had not completed the specialized classes by the time of the hearing. The mother also began classes for a GED but dropped out with no explanation. The mother additionally received individual counseling for a time, but she was unable to complete the program due to funding issues.

---

[2] DFCS introduced a copy of the second psychological evaluation performed on the mother at the hearing in lieu of the psychologist's testimony. In termination proceedings, "all information helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition. . . ." OCGA § 15-11-56 (a). See also *In the Interest of A. T. H.*, 248 Ga. App. 570, 574 (2) n.15 (547 SE2d 299) (2001) (applying rule to termination proceedings).

One caseworker testified the mother was not cooperative with the first parent aide DFCS provided, despite the fact that the juvenile court's August 2010 order found that she was participating with the aide. Beginning in 2011, however, AADD began providing parental counseling and sometimes had trouble getting the mother to cooperate. Marie Peters, the AADD outreach specialist, began making home visits with the mother in April 2011. By the time of the hearing, however, she had visited the mother's home only four to five times, which was fewer than usual because the mother was reluctant to allow Peters in her home.

The mother recently, however, allowed Peters to visit her new home. Although the mother lived in a series of homes that were not acceptable to DFCS, at the time of the hearing, she lived with the putative father in a two-bedroom townhouse, with two full bathrooms. The mother had a room set aside for D. J., with a toddler bed. The home was clean and had a fire extinguisher and two smoke alarms. During the visits Peters had in the mother's homes, they always appeared clean. Moreover, on one occasion, the mother demonstrated an ability to administer different forms of medicine, including using a syringe. She also demonstrated that she knows how to use a breathing machine for her own asthma, but Peters never had the occasion to observe her administer breathing treatments to D. J.

The mother's sole independent source of income was a social security payment, but it was sufficient to meet the stable income requirement of her case plan. The putative father was employed with Labor Ready, after working as a cook at Waffle House for 15 years. He is the payee on the mother's SSI income of $720 per month, and their rent is $550. In addition, he earns approximately $800 to $900 per month in income from his job, and they also receive approximately $320 per month in food stamps. Although the mother had failed to contribute to D. J.'s support, she brought him toys at her visits and gifts for holidays and his birthday.

Even though the mother had complied in substantial part with the case plan, the caseworkers had concerns about the mother's ability to parent D. J., to read his medication, to get him to appointments and to make sure he is safe and his needs are met. They also had concerns as to whether the mother understood the severity of D. J.'s medical issues. D. J. has asthma, and at the time of the hearing, he was undergoing physical therapy to address issues he had with walking and wearing a cranial helmet at night to re-shape his head. Sometimes the mother gave D. J. food and liquids at her visits that would aggravate his asthma symptoms or cause him to throw up.

All the witnesses conceded, however, that D. J. and his mother had a bond. The mother consistently maintained her weekly visits with D. J. Some observers testified that during these visits, the mother and D. J. were like two children playing with each other, which raised some concerns about the mother's ability to play a mother-child role, but the caseworkers testified that the mother's ability to nurture D. J. improved over time and she has basic parenting skills such as the ability to change a diaper. Peters testified, however, that although the mother loves D. J., but she has not seen that "mother child bond, that nurturing." She said the mother and child had no more of a bond on the last visit than they did on the first. Peters conceded, however, that the mother had the ability to perform daily living skills and could administer medications by reading the label. She also handles her own medical appointments.

At the time of the hearing, D. J. was still in foster care and had an adoptive resource with the guardians for his older siblings.

Based upon this evidence, the juvenile court granted the petition to terminate the mother's and the putative father's parental rights.[3] In addition to identifying the portions of the case plan completed by the mother and those still in progress, the

---

[3] The rights of putative father are not the subject of this appeal.

juvenile court found that the mother scores in the extreme low range of intellectual functioning and had no scores over the fifth grade, according to the second psychological evaluation; "[t]he Department *has concerns* regarding the mother's inability to comprehend information with limited insight and her inability to make rational decisions when it comes to raising a child with medical concerns;" "[t]he mother's cognitive function *may* impair her ability to properly care for the child's special medical needs;" her other three children are in the care of former foster parents via guardianship; and according to Peters, although the mother and child had a bond, the mother lacked the "nurturing component" of bonding or parenting needed for the child. (Emphasis supplied.) From this, the juvenile court concluded that the mother had failed to comply with a court-ordered plan designed to reunite her with her child for a period in excess of one year prior to filing the petition for termination of parental rights. The court also found that the mother failed to provide court-ordered child support or other financial support for D. J. in excess of one year prior to filing the petition. We conclude that these findings, and the evidence upon which they are based, are insufficient to support the termination of the mother's parental rights.

The statutory framework for the termination of parental rights sets out a two-pronged test:

> Before terminating a parent's rights, a juvenile court must employ a two-prong test. In the first prong, the court must decide whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15–11–94 (a). Parental misconduct or inability, in turn, is proven by evidence showing: (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation; (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15–11–94 (b) (4) (A). In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.

(Citation omitted.) *In the Interest of R. N. H.*, 286 Ga. App. 737, 739-740 (650 SE2d 397) (2007). In determining whether a child is without proper parental care or control when the child is not in the parent's custody, the court may consider

> whether the parent without justifiable cause has failed significantly for a period of one year or longer *prior to the filing of the petition for termination* of parental rights: (i) [t]o develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) [t]o provide for the care and support of the

12

child as required by law or judicial decree; and (iii) [t]o comply with a court ordered plan designed to reunite the child with the parent or parents.

(Emphasis supplied.) OCGA § 15-11-94 (b) (4) (C).

Accepting the prior findings that D. J. was a deprived child, the juvenile court found that the deprivation was caused by the mother's failure to comply with the case plan for a period of one year or longer prior to the filing of the termination petition. But even construing the evidence in the light most favorable to the judgment below, the record does not support this finding by clear and convincing evidence, and the termination order appears to ignore the juvenile court's prior findings regarding the mother's case plan progress.

It is undisputed that the mother had completed most of her case plan goals by the time the petition was filed in June 2011. The case plan required that the mother submit to a psychological evaluation. She, in fact, submitted to two such evaluations, one in January 2010 and the other in January 2011. By February 25, 2010, the mother had also completed the requirement that she attend a parenting class, and the trial court found she had completed a separate general parenting class with AADD in its September 20, 2011 order. The

mother also worked steadily toward achieving the requirement of stable housing, first in transitional housing, then in two separate one bedroom apartments, and by the hearing in January 2012, she had a two bedroom apartment with a bedroom set up for D. J., which met DFCS' requirements. Thus, in August 2010, the juvenile court found that the mother was making "favorable case plan progression," and by December 2010, her "only hurdle" was the referral to AADD. By June 14, 2011, five days after the petition was filed, the court found that she had met most of her case plan goals, and DFCS was reconsidering its plan to terminate her parental rights.

The only requirement that remained ongoing at the time of the hearing was the requirement that the mother follow the recommendations arising from the psychological evaluations.[4] The record indicates that she had completed some of these requirements, such as the parenting classes, and that circumstances beyond her control prevented her from completing others. For

---

[4] The 2010 psychological evaluation recommended working in a home environment with a counselor and a paraprofessional; that she find suitable housing, that she "may benefit"from participating in an adult reading program; and that visitation be supervised. The 2011 evaluation recommended family therapy if she were reunited with all her children; parenting classes; individual therapy; a psychiatric referral; a referral to the Georgia Department of Labor for job training; and a referral to an adult literacy class to help obtain her GED.

14

example, the mother participated in individual counseling until the funding ran out, and DFCS never referred her to a psychiatrist as the second psychological exam recommended. The mother also submitted to literacy testing, as recommended by the exams, but Floyd testified that she was not required to take literacy classes and a notation from a citizen's review panel indicates that she did not qualify for the literacy program. And although the mother never completed the GED class, the psychological exam only recommended that she be referred to the class. We could find nothing in the record to indicate that completion of the class was added as a requirement to her case plan.

The specific requirement that the mother participate with AADD's recommendations was not added to her case plan until April 2011, only two months before the petition was filed, and AADD first contacted her in December 2010, only six months before the petition. Accordingly, the record does not, and indeed cannot, contain evidence of a failure to comply with AADD's recommendations for one year or more prior to the filing of the petition as required by the statute. Moreover, the record shows that the mother was participating to some extent, albeit somewhat reluctantly, with AADD. For example, the order from June 14, 2011, indicates that the mother was becoming

more receptive to suggestions from AADD, and she allowed Peters to inspect her new townhome just prior to the hearing. Therefore, the juvenile court's conclusion that the mother failed to comply with the case plan for more than a year prior to the filing of the termination petition is not supported by clear and convincing evidence.

Similarly, the record lacks clear and convincing evidence, at least at this time, to support the trial court's finding that the cause of the deprivation is likely to continue, or will not likely be remedied because the mother continued to work on her case plan goals. Shortly before the hearing, she was able to obtain suitable housing and she had allowed AADD to visit the home. And although DFCS' witnesses all expressed concern that the mother might not be able to administer medicine to D. J., the evidence belied these concerns. She demonstrated to Peters that she was perfectly capable of reading labels and administering medicine in various ways, including through a syringe. Moreover, she could use a breathing machine to treat her own asthma. Although she had not demonstrated the ability to do the same for D. J., she was never given the opportunity to do so.

Moreover, the witnesses' anecdotal evidence about the mother – i.e., feeding the child too many snacks and playing with him in a childlike fashion – does not amount to clear and convincing evidence that she will never be able to parent her child. "[T]he clear and convincing standard 'safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior.'" (Footnote omitted.) *In the Interest of S. L. E.*, 280 Ga. App. 145, 151 (1) (633 SE2d 454) (2006). Although the juvenile court found that her cognitive functions *may* hamper her ability to make rational decisions regarding D. J.'s medical care, these findings were based solely on concerns voiced by lay witnesses, with no expert testimony on the issue. We cannot say, therefore, that this findings are supported by clear and convincing evidence. Cf. *In the Interest of C. A.*, 316 Ga. App. 185, 189-191 (1) (728 SE2d 816) (2012) (reversing termination order where no evidence presented of medically verifiable mental deficiency).

Further, although the evidence supported the juvenile court's finding that the mother had failed to provide court-ordered or other financial support for D. J., the record indicates that such payments were never made a part of her

17

case plan, and no testimony was presented that she was ever told that she was required to contribute financially. Although a parent's obligation to support her child exists, even in the absence of an order directing support,[5] we do not believe that this failure was sufficient to support a finding that the deprivation was likely to continue in light of the mother's other progress on her case plan. See *In the Interest of C. S.*, __ Ga. App. __ (1) (735 SE2d 140, 147) (2012). The testimony demonstrated that the mother brought presents and food when she had her weekly visits with D. J., and nothing in the record indicates that she might not be able to contribute at least a de minimis monetary amount toward her child's support in the future.[6]

In sum, although the mother has not acted in perfect compliance with all the recommendations given to her and has shown some reluctance to allow

---

[5] See, e. g., *In the Interest of T. B.*, 267 Ga. App. 484, 486-487 (1) (600 SE2d 432) (2004).

[6] Additionally, the record lacks clear and convincing evidence that continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child, at least at this time. Although the trial court made findings regarding the potential harm of continued foster care, the only evidence presented on this point was a question to Sullivan as to whether she knew "what foster-care drift is." She replied that it is when a child lingers in foster care, he may have bonding or trust issues and may start acting out, but she stated that D. J. was not displaying any of these symptoms because he is just two years old.

18

AADD workers into her home, the evidence shows that she has made substantial steps toward complying with DFCS' requirements, that she has maintained a bond with D. J., and that she continues to work on her case plan goals.

> As we have stated, termination of parental rights is a remedy of last resort and can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue. In the instant case, the evidence is not clear and convincing, at least at this time, that the deprivation is likely to continue. . . . Accordingly, we reverse the judgment and remand the case for establishment of a reunification plan for [the mother], subject to whatever disposition is warranted by future events and those occurring since the last termination hearing.

(Punctuation and citations omitted.) *In the Interest of C. S.*, __ Ga. App. at __ (1) (735 SE2d at 147). See also *In the Interest of M. A.*, 280 Ga. App. 854, 857 (1) (635 SE2d 223) (2006).[7]

*Judgment reversed. McFadden, J., concurs. Barnes, P. J., concurs specially.*

---

[7] Because we find that the evidence does not support the juvenile court's findings under OCGA § 15–11–94 (b) (4) (A), we need not reach the court's analysis regarding the child's best interest under OCGA § 15–11–94 (a).

19

A12A2176. IN THE INTEREST OF D. J., a child.

BARNES, Presiding Judge, concurring specially.

While I agree with the outcome reached in this case, I do not agree with all that is said by the majority. Therefore, this opinion decides only the issues in this case and may not be cited as binding precedent. See Court of Appeals Rule 33 (a). I write separately to emphasize that even if a parent has completed most of his or her case plan and wishes to be part of the child's life, termination of parental rights still may be appropriate where there is evidence that the parent has a medically verifiable mental disability that renders the parent unable to care for the essential needs of the child at the time of the hearing or for the foreseeable future. See OCGA § 15-11-94 (b) (4) (B) (i); *In the Interest of H. F. G.*, 281 Ga. App. 22, 26-27 (1) (635 SE2d 338) (2006). The problem in the present termination case is that DFCS failed to present any competent expert testimony to support and elaborate upon its allegations of the mother's cognitive impairment and its adverse impact on her ability to attend

to the special medical needs of her child. See *In the Interest of C. A.*, 316 Ga. App. 185, 189-190 (728 SE2d 816) (2012). However, nothing prevents DFCS from presenting such expert testimony in a future hearing if a new petition to terminate the mother's parental rights ultimately is filed in this case.