**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 19, 2015**

# In the Court of Appeals of Georgia

A15A1284. IN THE INTEREST OF: N. T., a child.

BOGGS, Judge.

The father of now seven-year-old N. T. appeals from juvenile court order terminating his parental rights to the child.[1] We hold that termination of the father's parental rights was premature, and therefore reverse.

> In considering the [father]'s appeal, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the [father]'s right to custody should have been terminated. We neither weigh the evidence nor determine the credibility of any witnesses, but instead defer to the juvenile court's findings of fact.

---

[1] We granted the father's application for discretionary appeal. Prior to the termination hearing, the mother surrendered her parental rights to N. T. and his half brother J. T. As such, the mother is not a party to this appeal.

(Citation and punctuation omitted.) *In the Interest o f A. B.*, 311 Ga. App. 629 (716 SE2d 755) (2011).

So viewed, the evidence showed that in June 2007, the father was released upon serving a sentence following his guilty plea to attempted robbery. The father claimed that he did not attempt to rob the victim, and that the victim only made the accusation after the father hurt him for punching his then-wife in the face.[2] In July 2007, the father met another woman, and N. T. was conceived shortly thereafter. In September 2007, however, he was incarcerated for a parole violation for communicating with his estranged wife. N. T. was born on April 30, 2008 during the father's incarceration.

In September 2008, when N. T. was five months old, the father was released, but was again incarcerated a day later for violation of parole after being accused of

---

[2] This was the father's second wife. The father testified that he was first married from 1984 to 1996 and that he had two children, twins, during this marriage, who are now adults. He explained that the twins lived with him and his first wife from the time they were born in 1985 until 1993 when their mother moved out and took the children to Georgia. He admitted that he had not seen the children very often over the years, but stated that he last saw them in December 2013.

biting his estranged wife. He claimed that she made the false allegation upon discovering that he had fathered a child with another woman.

During the father's incarceration, the mother and N. T. moved to Georgia, but later returned to New York. In September 2010, when N. T. was 30 months old, the father was released and began working for a temporary service. In October 2010, he filed for, and subsequently received, joint custody of N. T.

From October 2010 to February 2011, the father remained in New York with N. T. and his mother, and cared for the child. But in February 2011, he was again arrested for a parole violation. The mother alleged that the father "wanted [her] cell phone to look at porn," and when she refused, he "wrestled me for the phone. He broke the back door. I called police. I had bruises on my legs." The father claimed that he was arrested because of accusations made by the mother in retaliation for his calling child protective services upon discovering her doing drugs.[3] The father explained that soon after his arrest, the mother again took N. T. to Georgia and remained there.

---

[3] A New York court subsequently granted the father's petition for writ of habeas corpus. See page 5 infra. That court found that the "dissimilarities" between the mother's injuries observed by two police officers and her statement to police were significant. There was also evidence presented that drugs were present in the mother's home.

In May 2011, while the father remained incarcerated, a Georgia juvenile court entered an order for shelter care for N. T. and his half-sibling J. T., following the mother's request that they be placed in DFCS care because she did not have housing and could not provide for them. On May 11, 2011, the juvenile court entered orders finding that the children were deprived and granting DFCS temporary custody of them. The court issued an order directing DFCS to establish a case plan that required the father to legitimate N. T., resolve his legal issues, and demonstrate his ability and willingness to parent the child.

In May 2012, DFCS agreed to set up phone visits so that the father could talk with N. T. It was at this time that the father was notified that his case plan had been updated since he had provided proof of legitimation, and that the new goals for reunification were for him to provide stable housing and income (although he was still incarcerated), and "[c]omplete psychological and assessments and follow all recommendations." The case plan report indicates that the father was also required to complete a substance abuse assessment, a parental fitness assessment and a domestic violence assessment, all of which he completed.

In his communication with DFCS, the father expressed concern about an injury to N. T.'s leg while in foster care, and requested that the foster parents not feed him

4

pork. The father was also concerned that N. T. had been molested. A detective testified that he investigated the father's claim that N. T. told him he had been molested,[4] but that based upon N. T.'s failure to disclose sexual abuse during a forensic interview, the sheriff's department would not conduct any further investigation. The DFCS investigator also testified that she found no evidence of abuse.

An August 2012 case plan report indicated that the father had legitimated N. T. and that the other plan goals were ongoing. The report also noted that the father had been writing to N. T. and sending him drawings, and that he "will have phone visitation with his son." The father was released in October 2012 following the grant of his petition for writ of habeas corpus. The habeas court concluded that the father was denied his statutory and constitutional rights to confront and cross-examine the mother about the allegations leading to his arrest for violation of parole in February 2011. Upon his release, he completed a job training program as well as a parenting class in New York.

---

[4] N. T. told the father that his foster father, "likes kissing my no-no box." A DFCS investigator testified that N. T. told her "that a child at daycare had touched his no-no square and reported that that was reported to the daycare. He didn't go anywhere as far as any adults . . touching him or kissing him or anything in his private area."

On January 3, 2013, DFCS filed a petition for termination of parental rights. On January 24, 2013, because the father was prohibited from leaving the State of New York until March 21, 2013, the juvenile court ordered the father to complete a psychological evaluation and bonding assessment as soon after that date as possible. The father was released from parole in March 2013, and the same week of his release made a trip to Georgia to see N. T. At that time N. T. had been in the custody of DFCS for nearly two years. The father applied for housing and sought employment in Chattanooga, Tennessee, just across the Georgia state line from Walker County where N. T. resided with his foster parents. There he completed a program to aid in finding stable housing and employment. He also began supervised visits with N. T. during this time. The father testified that he submitted several job applications but was never interviewed, and that he had to cancel the only interview he was given because he had to be in court. Although he was advised to stay in Chattanooga, he claimed a lack of employment opportunities there and moved to Texas to live with his brother. The father moved into his brother's home in April of 2013 and immediately found employment.

On April 6, 2013, the juvenile court issued an order of adjudication and disposition in which it found that the causes of deprivation as to the father were

unstable housing and failure to provide adequate support for the child due to unstable or irregular employment. The court ordered that custody of N. T. remain with DFCS, and that the permanency plan was reunification:

> The facts supporting continued efforts toward reunification are: the Father was recently released from prison. It's too early to specify a time certain for reunification because: parents have not completed their case plans. The Court finds that the concurrent permanency plan for the child is: Adoption following Termination of Parental Rights.

A September 2013 case plan report noted that the father had completed all assessments, and that he had given copies of check stubs from his employment in Texas to his attorney and to DFCS, that he had given "paperwork to his attorney and the department to show that he is no longer on probation or under parole," that he had weekly phone visitation with N. T. and when he "is in town he is given an opportunity to have a supervised visitation with [N. T.]" On the same date, the juvenile court entered a supplemental order again noting that the concurrent permanency plan was for reunification and adoption. Subsequently, on October, 23, 2013, the mother surrendered her parental rights to N. T.

While in Texas, the father suffered a hernia injury while lifting a treadmill. After being evaluated by doctors, he was told that he needed surgery to repair the

injury. After he experienced difficulty getting medical insurance in Texas, he moved to New Jersey to obtain medical insurance. The father left Texas about 30 days before the January 30 - February 4, 2014 termination hearing.

At the time of the hearing, the father had lived with the cousin in New Jersey for 30 days and was employed as a pizza delivery driver. He stated that he understood that this cousin could not be approved for N. T.'s placement because she had a felony conviction. The father explained that once he received medical care he plans to move back to Texas: "That's where basically all my family's at. I have resources out there in Texas. I have a lot of resources. With my CDL license in Texas, I know I can get a good job." The father testified that once he obtained his hernia surgery in New Jersey, he will complete the six to eight-week CDL tractor trailer training course he had registered for there and expected to be employed by late spring, a few months following the hearing. He testified further that each time he comes to Georgia for a proceeding in juvenile court, he visits N. T., but that it's expensive for him to get transportation to and from the state.

The father explained that the only financial support he has provided to N. T. was in the form of "little gifts, a little clothing. I've been doing that. And while I was in prison, it wasn't much, but I wrote [N. T.], like, twice a month, sent him little

8

handkerchiefs, pictures." He stated he has provided shoes, food, and clothing for N. T. since his release. The father also purchased birthday and Christmas gifts for N. T. He claimed that in May 2012, a Georgia "judge gave [him] a court order for [him] not to pay any child support for a period of two years," and directed him to pay medical insurance:

> And when I got out, . . . I called Mr. Gary Cline.[5] Gary Cline said, No, you do not have to get medical insurance because [N. T.] already has medical insurance. Then I wanted to send [N. T.] some money and I wanted to send the foster parents some money, and then Mr. Gary Cline said, No, please do not send any money. The most you could probably send is $5 and I'll take a picture of [N. T.] holding the $5. That way you'll know that he got it.

A DFCS caseworker assigned to N. T.'s case testified that she arranged for the father to have phone calls with N. T. while he was incarcerated beginning in July 2012. She explained that "[N. T.] had a little bit of trouble adjusting to the phone calls" and that he would cry and become upset and did not want to talk to his father in the beginning. But over time, N. T. began participating and the calls were longer in duration. She explained that the father would send N. T. letters and drawings

---

[5] Cline was N. T.'s case manager from the summer of 2013 to February 2013.

9

during his incarceration. The executive director of a supervised visitation program testified that the father visited N. T. in person seven times beginning in June 2013, and that since that time he also had 28 phone visits with N. T. out of the 30 phone visits scheduled. Another employee of the supervised visitation program noted that while N. T. stated during phone calls that he wanted the father to come for a visit, she believed that his desire for a visit was due to his desire to play on the playground and get gifts and money from the father. But she acknowledged that over the past seven or eight months following the father's release, he and "[N. T.] are much closer than they were in the beginning."

Another caseworker testified that in April 2013, at the request of the father, she completed an "ICPC packet" to assess the home of the father's brother for placement of N. T. She explained that DFCS had generally approved the brother's home in Texas for placement of N. T., but not for placement there with the father because he was currently granted only supervised visitation. The caseworker explained further that the father provided her proof of income on one occasion in 2013 when he lived in Texas, but had not provided her with any recent proof of income. She stated that DFCS would be seeking to place N. T. for adoption by the foster parents, who expressed a desire to adopt him.

During an in camera interview at the termination hearing, the following colloquy took place between N. T., then five-years-old, and the trial court:

The Court: He asked you if you wanted to go to Texas with him?

[N. T.]: (Witness moved head up and down.) I have to ask the judge. I do want to.

The Court: Do you want to leave who you call your daddy?

[N. T.]: Uh-huh.

The Court: Huh? Do you like living with your daddy or you like living with [the father]?

[N. T.]: [the father]

The Court: Do what?

[N. T.]: [the father]

The Court: Why is that?

[N. T.]: Because I love him.

The Court: You love him?

[N. T.]: Uh-huh

The Court: Why do you love him?

[N. T.]: Because I do because he's my dad.

A social worker testified that when she asked N. T. if he wanted to go and live with his father, N. T. responded that he did. When she explained that living with the father meant he would not be with his foster family, he "became teary-eyed" and said he did not want to go. The foster mother testified that N. T. was placed in her home in June 2011 and that by March 2013 a parent/child relationship was solidly in place. She explained that she and her husband are "ready to give [N. T.] a forever home." Her husband, the foster father, did not testify.

A clinical psychologist conducted a bonding assessment for N. T. and the father in March 2013. She concluded that N. T. got comfortable with the father "but there was never a - - from my observation the level of bonding that there was with the foster parents." She acknowledged, however that "there never really could be because of the intensity of time spent between the foster parents and [the father]." She stated further that N. T.'s needs are being met by the foster parents, not the father. While she testified that the father's "instability is so strong . . ., I would not put a child in his

care," she confirmed that nothing indicated that the father should not have future contact with N. T., and that she did not know if future contact would be detrimental. She stated that early on there was an indication that the relationship between the father and N. T. was detrimental to N. T. because he was afraid and "very uncomfortable," but admitted she really did not have enough information to make that assumption at the time of the hearing and that she would need an updated assessment. She also stated that even if the father obtained stable housing and employment in the future, she would not change her recommendation that he could not parent N. T. The psychologist's opinion was based upon her belief that N. T. needed stability and not to be in limbo: "children need to know who their parents are or foster parents are to become adoptive parents and the longer instability continues the more unsettled they are." She could not answer the question of whether breaking contact with the father would be harmful to N. T. without further evaluation of the child.

The psychologist prepared an updated bonding assessment for N. T. and the father based upon 45 minutes of observation the day before her testimony on the last day of the hearing. She explained that N. T. knows that "[h]e has two dads," that he is comfortable with the father, but that "[N. T.] does not show bonding signals back to him very much" and does not show the father "that much affection." She explained

13

further that the bond between N. T. and the father is not a parental bond, and that N. T. has a strong parental bond with his foster parents. She stated further: "I don't want to diminish the bond with [the father]. He is trying very hard to be part of this child's life and [N. T.] knows that. Okay. But it's more like a play date. They go and they play, and [the father] works hard at that and [N. T.] responds to that." She concluded that removing N. T. from the custody of his foster parents would be traumatizing for the child and that he needs to remain with them for his emotional well-being. The psychologist admitted however, that the bond between N. T. and the father was stronger than it was in the beginning and that N. T. views him as his "other father." And when asked if it would be detrimental to N. T. if the relationship with the father was cut off, she responded: "In the best interest of [N. T.] I think it would be appropriate to have some contact, but having said that, I think it needs to be at the discretion of the - - whoever's going to be his long term parents." The guardian ad litem submitted a letter to the court listing when he had observed N. T. and what documents he had reviewed in the case, and summarily recommended that the father's parental rights be terminated.

In a 44-page order, the juvenile court terminated the father's parental rights to N. T. The father filed a motion for new trial asserting in part that his trial counsel was

ineffective. At the hearing on the motion in November 2014,[6] eight months after his parental rights were terminated, the father explained that he was a professional driver with TransAm trucking, had his "first operation" for his hernia, and would have a court hearing for child support in December 2014. The juvenile court denied the motion concluding that the father received effective assistance of counsel, and again focused upon the lack of a parental bond between the father and N. T. and the strong bond the child had with his foster parents. The court commended the father on his accomplishments since the termination hearing finding that "this progress was not likely under the evidence at that time," and concluded that because the father would likely not be able to develop a meaningful, supportive parental bond with N. T., harm would come to the child if he were returned to his father.

The father appeals, challenging the sufficiency of the evidence, specifically, the sufficiency of the evidence that the cause of the deprivation is likely to continue or will cause N. T. serious physical, mental, emotional or moral harm.

The new Juvenile Code, which became effective on January 1, 2014, applies to those juvenile proceedings commenced on or after that date. See Ga. L. 2013, p.

---

[6] Counsel for N. T. did not appear at the hearing but submitted a letter to the court stating that he "would be opposed to a new [ ] trial."

294 § 5-1. Thus, the former code applies here because the order for shelter care and deprivation order were entered in May 2011. See *In the Interest of F. A. G. R.*, 328 Ga. App. 88, 89 n.1 (761 SE2d 512) (2014).

Under the former Code, the termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. See former OCGA § 15-11-94 (b) (4) (A) (i) - (iv). If these four factors are found to exist, then the juvenile court must ascertain whether termination of parental rights is in the best interest of the child, considering his or her physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. See former OCGA § 15-11-94 (a); *In the Interest of A. G.*, 293 Ga. App. 383 (667 SE2d 176) (2008).

1. *Deprivation.* The father did not appeal the juvenile court orders finding N. T. to be deprived. He is therefore bound by the court's findings with regard to deprivation. See *In the Interest of I. S.*, 278 Ga. 859, 861 n. 6 (607 SE2d 546) (2005). The most recent deprivation order found N. T. deprived as to the father because of the

16

father's unstable housing and failure to provide adequate support for the child due to unstable or irregular employment.

2. *Lack of proper parental care and control is the cause of the deprivation.* In determining whether a child is without proper parental care or control, the juvenile court is entitled to consider the factors outlined in former OCGA § 15-11-94 (b) (4) (B):

> (i) A medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child; (ii) Excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child; (iii) Conviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship; (iv) Egregious conduct or evidence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature; (v) Physical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent; and (vi) Injury or death of a sibling under circumstances which constitute substantial evidence that such injury or death resulted from parental neglect or abuse.

17

Here, the juvenile court found no clear and convincing evidence with regard to factors i, ii, iv, and vi. The court did find, however, that as outlined in OCGA § 15-11-94 (b) (4) (B) (iii) and (v), that the father's history of incarceration, lasting about 48 months of N. T.'s life, had a demonstrable negative affect on the parent-child relationship, and his failure to parent, rear, or support his now-adult children, supported a finding that the lack of proper parental care and control is the cause of N. T.'s deprivation.

OCGA § 15-11-94 (b) (4) (C) provides that in addition to the considerations in subparagraph (B),

> where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents[.]

In considering these additional factors, the juvenile court found that the father failed to establish a parental bond with N. T., and that the foster parents had a strong parental bond with the child, and that the father failed to demonstrate an ability to

parent N. T. as required by his case plan. The court noted that although the father completed parent training and a course on strategies for obtaining and sustaining employment, he chose to leave Chattanooga, after only a few weeks, where he was close in proximity to N. T., and move to Texas exemplifying an "instability that has resulted in his inability to parent [N. T.] at this time."

Under these circumstances, clear and convincing evidence supported the juvenile court's conclusion that the father's lack of proper parental care and control caused N. T.'s deprivation. See, e.g., *In the Interest of A. G.*, 293 Ga. App. 383, 386 (2) (667 SE2d 176) (2008) (mother's failure to, among other things, take the steps necessary to develop a parental bond with children, failure to finish her GED, develop job skills, and maintain employment provided clear and convincing evidence that her lack of parental care and control was the cause of deprivation).

3. *The cause of the deprivation is likely to continue*. The juvenile court found that the evidence of the father's past conduct "convinced the Court that the deprivation will likely continue."

> Although it is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue, it is equally true that evidence of past unfitness, standing alone, is insufficient to terminate the rights of a

19

parent in her natural child; clear and convincing evidence of present unfitness is required.

(Citations and punctuation omitted.) *In the Interest of K. D. E.*, 288 Ga. App. 520, 523-524 (1) (654 SE2d 651) (2007).

The juvenile court found that

[the father] has made an effort to stabilize his life after being released from prison and to form a meaningful parental bond with [N. T.] with minimal success. His criminal history has prevented him from obtaining and maintaining sufficient income to provide for the basic necessities of life for [N. T.], and it continues to do so. Although his parole is now completed, [the father] is still in contact with the same individuals that he associated with when his crimes were committed. He is living with [a relative] who has a felony record for distributing illegal drugs. He has resided in a shelter, a rental home that did not work out, a motel, his brother and his sister in the last 10 months. He admits to still being in regular contact with the same individuals who he contends maliciously caused his parole to be revoked at least 2 times. It is highly unlikely that he will ever be able to form a parental bond with [N. T.] of a meaningful and supportive nature beyond the relationship that they now enjoy.

But the question is whether the *causes* of deprivation are likely to continue. Specifically, whether there is *clear and convincing* evidence that the father will continue to have unstable housing and continue to fail to provide adequate support

20

for the N. T. due to unstable or irregular employment. At the time of the hearing, the father had admittedly for the past 30 days resided with a cousin who had a criminal conviction for distributing drugs as the juvenile court found. But as the father testified, he relocated to New Jersey for the purpose of getting medical care for his hernia, care he claimed he could not receive in Texas where he had lived with his brother for about eight months, and during which time he was successfully employed. The father stated that he understood that his cousin's home would not be approved as a suitable home for N. T., but explained that he desired to have his brother's home in Texas approved once he returned after undergoing surgery. While the father did not provide court-ordered child support or any other financial support because he claimed that he was told not to send money, he consistently provided the child with clothing, gifts and food. Even while the father was incarcerated, he sent N. T. letters, drawings and handkerchiefs.

> Although a parent's obligation to support h[is] child exists, even in the absence of an order directing support, we do not believe that this failure was sufficient to support a finding that the deprivation was likely to continue in light of the [father's] other progress on h[is] case plan. . . And nothing in the record indicates that [ ]he might not be able to contribute at least a de minimis monetary amount toward h[is] child's support in the future.

21

*In the Interest of D. J.*, 320 Ga. App. 247, 255-256 (739 SE2d 730) (2013) (physical precedent only). The juvenile court's focus mostly on the father's status at the time of the termination hearing does not establish clear and convincing evidence that the cause of deprivation is likely to continue, in light of his efforts while he was incarcerated and during the other eight months following his release. At the time of hearing, he was employed as a pizza delivery driver, had temporary housing in order to undergo a medical procedure, and provided the child with de minimis support. And prior to his move to New Jersey, in the months following his release from incarceration, he maintained housing with his brother, was employed, and provided DFCS with proof of that employment, attempted to bond with N. T. with in-person and phone visits, and provided gifts, some food, and clothing to the child.

"[T]ermination of parental rights is a remedy of last resort and can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue. In the instant case, the evidence is not clear and convincing, *at least at this time*, that the deprivation is likely to continue." (Citations, punctuation and footnote omitted; emphasis supplied.) *In the Interest of C. S.*, 319 Ga. App. 138, 148 (1) (735 SE2d 140) (2012) (insufficient evidence that cause of deprivation likely to continue where although father did not at all times act in an exemplary manner,

22

case did not only consist of positive promises and father's effort to maintain a bond with his child was consistent throughout); see also *In the Interest of R. C. M.*, 284 Ga. App. 791, 799-800 (III) (3) (645 SE2d 363) (2007) (where father never abused or neglected children, children became deprived when he was arrested, case plan included goals father could not achieve while incarcerated, and petition to terminate was filed while father was still incarcerated before he had a real opportunity to complete case plan goals, juvenile court's findings that cause of deprivation likely to continue was not supported by clear and convincing evidence); *In the Interest of K. J.*, 226 Ga. App. 303, 307-308 (2) (b) (486 SE2d 899) (1997) (father and child had positive relationship to the extent permitted by father's incarceration and no evidence presented that child likely to suffer serious harm in absence of termination of parental rights).

4. *Continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.* Notwithstanding our holding in Division 3 above, we hold further that there is insufficient evidence that continued deprivation is likely to cause N. T. serious physical, mental, emotional or moral harm. The juvenile court found that because the father had no parental bond with N. T., the child was thriving in foster care, and the foster parents want to adopt him, N. T. would suffer emotional

23

harm the longer his life was in limbo. But "the juvenile court has no authority to sever the natural parent-child relationship simply because it believes the child would be better off with the foster family." *In the Interest of J. V. J.*, 329 Ga. App. 421, 428 (765 SE2d 389) (2014). In relying on the testimony of the clinical psychologist, the trial court found:

> If continued contact with the father prevented [the foster parents'] adoption of [N. T.], it would be devastating to [N. T.] She noted that it is very important for [N. T.] to have permanency with the foster parents deciding if he should have contact with his father, otherwise the continued contact with the father would be confusing, create anxiety and could cause decomposition manifested by [N. T.] becoming unsettled, acting out and becoming very upset.

But this finding is an inaccurate summary of the psychologist's testimony. She testified that if the bond was broken between N. T. and *the foster parents*, it would be "highly traumatic causing depression, upset, anxiety and all the other things that come out of breaking that." In fact, when asked if she thought it would be detrimental for N. T. to have contact with the father, the psychologist responded, "that is a very good question and it's an important question and it is one that I have been thinking about. In the best interest of [N. T.] I think it would be appropriate to have some contact. . . I think it needs to be at the discretion of the - - whoever's going to be his

24

long-term parents." On redirect, the psychologist explained that continued contact would be devastating to N. T. *if* it meant that N. T. would have to be removed from the foster parents' home, and that *if* N. T. learns that there is a possibility of being removed from their care he "could begin acting out and just be very upset." There was no evidence presented that the father's present relationship with N. T. was detrimental to his well-being. See *In the Interest of S. O. C.*, 332 Ga. App. 738, 746 (3) (774 SE2d 785) (2015).

> As the Supreme Court of the United States so eloquently explained in the seminal decision of *Santosky v. Kramer*, [455 U. S. 745 (102 SCt 1388, 71 LE2d 599) (1982)], the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."

(Citations, punctuation and footnotes omitted.) Id. at 746-747 (3).

Here DFCS filed a petition to terminate the father's parental rights in January 2013, after his release via the grant of a petition for writ of habeas corpus but before March 2013, when he was allowed to leave the state of New York. This gave the father nine months to complete his case plan, the most recent report of which (October 2013) stated that the goals were either ongoing or achieved. As the juvenile

25

court acknowledged, the father "has been consistent and persistent in his effort to get to know [N. T.], beginning while he was incarcerated though the present date." Although the evidence showed that the bond was not a parental bond, there was no evidence presented that continued efforts to reunify N. T. with his father would cause serious physical, mental, emotional, or moral harm to the child.

"While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship,"(citations, punctuation and footnote omitted.) *In the Interest of C. S.*, supra, 319 Ga. App. at 148 (1), and "it must be scrutinized 'deliberately and exercised most cautiously.'" (Citations, punctuation and footnotes omitted) *In the Interest of J. V. J.*, supra, 329 Ga. App. at 429. The evidence below did not clearly and convincingly establish that the cause of N. T.'s deprivation was likely to continue or that it would cause the child serious physical, mental, emotional or moral harm. Accordingly, we reverse the judgment and remand the case for establishment of a reunification plan for the father, subject to whatever disposition is warranted by future events and those occurring since the termination hearing. See *In the Interest*

*of C. S.*, supra, 319 Ga. App. at 148 (1).[7] We express no opinion about whether termination might be warranted based upon future conduct.

*Judgment reversed. Doyle, C. J. and Phipps, P. J., concur.*

---

[7] Because we hold that the evidence does not support a determination that the cause of deprivation is likely to continue and that N. T. would be seriously harmed by the deprivation, we do not reach the inquiry concerning the best interests of the child.