**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 29, 2016**

# In the Court of Appeals of Georgia

A15A2015, A15A2016. IN THE INTEREST OF S. P., a child (two cases).

McFADDEN, Judge.

In these appeals, the mother of minor child S. P. appeals from two orders of the juvenile court: an order terminating her parental rights and awarding permanent custody to the Department of Family and Children Services ("DFCS") to be placed for adoption (Case No. A15A2016), and an order declining to appoint the girl's maternal grandmother as her permanent guardian (Case No. A15A2015). She argues that the evidence compelled different rulings from the juvenile court. Because the evidence authorized both rulings, we affirm.

As an initial matter, we note that Georgia's new Juvenile Code, which applies to juvenile proceedings commenced on or after January 1, 2014, see Ga. L. 2013, p.

294, § 5-1, applies to these cases. Case No. A15A2016 concerns a termination proceeding that commenced on July 3, 2014, when DFCS filed a petition to terminate the mother's parental rights. See *In the Interest of C. J. V.*, 333 Ga. App. 844, 848 (2) (777 SE2d 692) (2015) (applying new Juvenile Code to termination decision because termination petition was filed in 2014). See also OCGA § 15-11-16 (a) (3) (a proceeding under the new Juvenile Code "may be commenced . . . by the filing of a complaint or a petition as provided in Article[]. . . 4 . . . of [the new Juvenile Code]," among other ways); OCGA § 15-11-280 (section within Article 4 of the new Juvenile Code providing for the filing of a petition to terminate parental rights). Case No. A15A2015 concerns a third party's motion to intervene in that termination proceeding for the purpose of being appointed permanent guardian of the child. Compare *In the Interest of J. M. L.*, __ Ga. App. __ (__ SE2d __) (Case No. A15A2359, decided March 29, 2016) (old Juvenile Code applied to permanent guardianship decision made in response to motion filed in 2014 in deprivation proceeding that had been commenced before January 1, 2014).

    1. *Facts and procedural history.*

    "On appeal from a juvenile court's decision to terminate parental rights, we review the evidence in the light most favorable to the court's decision and determine

2

whether any rational trier of fact could have found clear and convincing evidence that the parental rights should be terminated." *In the Interest of C. S.*, 319 Ga. App. 138, 139 (735 SE2d 140) (2015) (citation omitted). Our Supreme Court has stressed that, "[i]n the appellate review of a bench trial [such as, in this case, the evidentiary hearings on the motions for termination of parental rights and appointment of a permanent guardian], . . . due deference must be given to the trial court, acknowledging that it has the opportunity to judge the credibility of witnesses." *Strickland v. Strickland*, __ Ga. __, __ (1) (__ SE2d __) (Case No. S15G1011, decided March 7, 2016) (citations omitted).

Viewed in the light most favorable to the juvenile court's decision, the evidence showed that S. P. was born on January 14, 2011. At the time, her mother was incarcerated for a probation violation on a forgery conviction, and upon her birth S. P. went to live with her maternal grandmother. When S. P. was 20 months old, her mother was released from incarceration and moved into the household with S. P. and her grandmother. Four months later, in January 2013, the mother was arrested and incarcerated after an altercation in the child's presence between the mother, the grandmother, and an aunt (the mother's half-sister). Upon the mother's arrest, DFCS obtained custody of S. P. because the mother refused to enter into a safety plan that

3

would permit the girl to remain with the grandmother. (DFCS later declined to approve the grandmother's home as a placement for S. P. following a home evaluation. ) Finding no other relative who could care for S. P.,[1] DFCS placed the girl into foster care. After an initial placement with another family, in May 2013 S. P. was placed into care with the foster family with whom she currently resides. Her foster parents would like to adopt her.

The juvenile court adjudicated S. P. deprived in February 2013 in an unappealed order to which the mother, who was represented by counsel, stipulated. In that order, among other things, the juvenile court stated that S. P. was deprived due to the mother's incarceration, the mother's history of substance abuse, and the incident of domestic violence between the mother and the grandmother. The juvenile court also entered an order incorporating a reunification case plan for the mother, which required that she: (1) complete a drug and alcohol assessment, follow any recommendations made, submit to random drug screens, and establish six months of clean screens; (2) complete a psychological evaluation and follow any recommendations made; (3) obtain and maintain safe and stable housing; (4) obtain

---

[1] S. P.'s biological father informed DFCS that he was not interested in custody and subsequently voluntarily surrendered his parental rights to the girl.

4

and maintain a stable, legal income; (5) complete age-appropriate parenting classes and demonstrate skills learned; (6) resolve all pending legal issues and commit no further violence of the law; (7) refrain from committing or exposing S. P. to domestic violence; (8) establish and maintain a bond with S. P. through regular visits upon the mother's release from incarceration; (9) provide a specified amount of child support to DFCS beginning no later than 60 days from her release from incarceration; (10) reimburse the juvenile court for attorney fees in a specified amount; and (11) cooperate with DFCS and all other agencies providing services to her, including notifying DFCS of changes to her address, telephone number, and employment within 48 hours of the change.

The mother began working on the reunification case plan while she was incarcerated, obtaining a psychological evaluation in which she was diagnosed with anti-social personality disorder and aspects of dependent personality disorder. After she was released from incarceration, she began working on other aspects of her case plan. For a period of time she obtained housing and part-time, but not full-time, employment. She also initially participated in visits and joint therapy with S. P. and received individual counseling, but as time passed she became inconsistent and began missing appointments.

In several interim orders during this time period, the juvenile court found that the mother's psychological conditions were impeding her ability to meet her case plan goals. In an October 2013 order following a citizen panel review, the juvenile court stated that S. P. would remain at risk until the mother addressed her psychological and legal issues and expressed concern about "the mother's non-compliance with substance abuse treatment." In a January 2014 temporary disposition order, the juvenile court adjudicated S. P. dependent, noting that the mother still needed to address her psychological condition and that the mother had consented to the child remaining in DFCS custody. And in an unappealed April 2014 order of disposition and permanency, which followed evidentiary hearings, the juvenile court held that S. P. remained dependent because, although the mother had complied with some aspects of her case plan, she needed additional work on her stability and significant mental health issues. The order of disposition and permanency listed reunification and adoption following termination of parental rights as concurrent goals.

In the order of disposition and permanency, the juvenile court found that an unhealthy relationship existed between the mother and grandmother that affected the mother's ability to address her psychological conditions and work on her case plan goals. The juvenile court pointed to evidence that the relationship between the mother

6

and grandmother was "toxic" and that the grandmother was a controlling individual who had abused the mother both as a child and adult; that the mother needed to establish boundaries to protect both herself and S. P. from an unhealthy relationship with the grandmother; that the mother knew her failure to resolve this issue "could be a barrier to her being reunified with [S. P.]; and that the mother nevertheless remained dependent upon the grandmother and "ha[d] been unable to implement boundaries with [her]." In an earlier interim order, the juvenile court had forbidden the grandmother's presence at visits between S. P. and the mother, and in the order of disposition and permanency the juvenile court stated that she "remain[ed] incredibly concerned about the mother's allowing the child to have any contact with [the grandmother]."

After the hearings that led to the April 2014 order of disposition and permanency, the mother was arrested twice, first on bad check charges and then on shoplifting and drug charges. During this time she also was jailed in connection with unpaid parking tickets, causing her to lose her job. Incarceration prevented her from attending her joint therapy sessions and visitation with S. P.

On July 3, 2014, DFCS petitioned to terminate the mother's parental rights. The termination petition alleged, among other things, that the mother had not resolved

her psychological issues, that she had missed counseling sessions, that she continued to engage in destructive relationships and risk-taking behavior, that she failed to meet her case plan goal of resolving pending legal issues and committing no further violations of the law, that she failed to maintain and establish a bond with S. P., that she missed visitation with the girl during periods of incarceration and for other reasons, and that she failed to pay child support on a regular and consistent basis. Subsequently, the grandmother moved to intervene in the termination proceeding and petitioned to be appointed S. P.'s permanent guardian.

The juvenile court held a series of evidentiary hearings on the petitions and motion. At those hearings, the mother acknowledged that she had failed to complete her case plan goal of resolving all pending legal issues and committing no further violations of the law. At the time of the second hearing, she was again incarcerated on pending shoplifting and drug charges. Earlier in the year she had been jailed for outstanding traffic tickets and arrested for writing a bad check. She also admitted that she had a long and extensive criminal history and had been arrested more than 15 times over her lifetime for a variety of offenses. At times, incarceration kept her from visiting S. P.

When asked why she continued to break the law, knowing that this hindered her efforts to reunite with S. P., the mother stated that she has "bouts of not being able to maintain for long periods of time I think as a means of survival." This inability to maintain an appropriate level of mental fitness for long periods of time was a recurring topic in the mother's hearing testimony, which included her statements that she "just go[es] into deep bouts of depression [and] can't maintain through a certain amount of time"; that she "could not . . . maintain [her] life for long periods of time"; that she would achieve some of her case plan goals but then "just kind of f[a]ll apart" and wind up back in jail; and that she needed "some time to get [her]self together as far as being able to maintain [her] life," which she agreed would take a lengthy amount of time.

Evidence at the hearings showed that the mother had not met other case plan goals, as well. She initially obtained stable housing but was not able to maintain it. She was incarcerated at the time of the hearings and anticipated moving into a substance abuse rehabilitation facility as a condition of bond. She had not obtained full-time employment and had twice been terminated from part-time employment (once for missing too much work and once when she was in jail). She had not paid all of her child support obligations while S. P. was in foster care.

9

At the hearings, the juvenile court received expert testimony from the clinical psychologist who initially evaluated the mother. He described her diagnoses (antisocial personality disorder and dependent personality disorder) and testified that, among other things, the mother was self-centered and had poor internal controls. The clinical psychologist explained that a person with the mother's diagnoses would perform better with external controls (e.g., under court or DFCS supervision) and would "have periods of normalcy, but over time it generally collapses." He further explained that such conditions generally are less amenable to treatment because they reflect behaviors learned over time that are very difficult to change. The clinical psychologist testified that the mother had described to him her unhealthy relationship with the grandmother, including a history of the grandmother verbally abusing the mother, and she had told him that she specifically requested that S. P. be placed with DFCS rather than the grandmother when the mother was arrested in January 2013. Based on the mother's diagnoses, the clinical psychologist opined that the conflict between the mother and the grandmother was likely to continue and would be detrimental to a child; that her regular incarcerations reflected a "continued pattern" that would be difficult for her to change; and that it was unlikely she would be able

to meet S. P.'s needs for permanency, given that she had essentially missed four years of bonding with the child and remained incarcerated.

A DFCS employee also testified about the decision not to place S. P. with the grandmother when the mother was arrested. She stated: "We tried to safety plan [S. P.] with [the grandmother] when she first entered care, and [the mother] stated that she didn't want [S. P.] placed there, that she was violent and she was afraid that she wouldn't keep her child safe." There was evidence that the mother viewed her relationship with the grandmother as "toxic" and at one point after S. P. was taken into care the mother had contemplated getting a protective order against the grandmother or distancing herself from the grandmother in other ways. Nevertheless, when the mother was released from incarceration after her January 2013 arrest, she returned to live with the grandmother. There was no evidence of any further domestic violence involving the mother and her family members after S. P. was taken into care.

The juvenile court received expert testimony from the mother's counselor, who described the mother's inconsistent commitment to counseling. The mother began counseling in November 2013 and regularly kept her appointments and completed assignments until January, when she began to get inconsistent. As 2014 progressed, the mother was more sporadic about making and keeping counseling appointments.

11

She began missing appointments and, at the time of the termination hearing, had not kept an appointment with the counselor in several months, which the counselor found "troubling." The counselor had concerns about the mother's ability to raise S. P. due to her inability to be consistent. She testified that the mother had a pattern of "physically not being there" to raise her child. She also testified about the mother's unhealthy relationship with the grandmother, which had been a significant focus in the mother's individual therapy. The mother told her counselor that the grandmother was verbally and emotionally abusive to her and that she wanted to protect S. P. from the grandmother. Based strictly on her therapy with the mother, the counselor testified that she would have concerns about placing S. P. with the grandmother. In the counselor's opinion, the mother would need at least a year of therapy before the counselor could determine whether she was making lasting changes.

S. P.'s psychologist also gave expert testimony at the hearings. In April 2013, she began treating the girl, who initially displayed anxiety and some developmental delays but quickly made significant progress; the psychologist attributed S. P.'s progress to the stability and consistent support of the girl's foster family. The psychologist testified that S. P. needed consistency and familiarity, that the lack of these things made her scared and anxious, and that "people being in and out for her

. . . would be very traumatic." The psychologist anticipated that if S. P. remained in her current home with her foster family she would only need therapy for a few more months.

S. P.'s psychologist conducted joint therapy sessions to give the mother an opportunity to bond with the girl. At the hearings, she described instances in which the mother impeded the development of a bond between the two and caused the girl confusion, stress, and anxiety because she was unwilling or unable to follow the psychologist's instructions regarding the joint therapy sessions. The psychologist testified that the mother did not seem to appreciate the problem.

The psychologist also testified about the mother's inconsistency in attending the joint therapy sessions. Initially she was diligent, but in May 2014 she began missing sessions, often without notifying the psychologist. On one occasion, the mother called the psychologist to apologize for missing a therapy session, and the psychologist noticed that the mother's voice was extremely slurred and that she "did not sound like herself." The mother also missed sessions because she was incarcerated.

The psychologist testified that the mother and S. P. interacted in a positive way during the therapy sessions but did not appear to have a parent-child bond. In the

psychologist's opinion, S. P. had a stronger bond with her foster parents and with the person assigned to drive her to and supervise visits than she did with the mother. When the mother stopped attending sessions because she was incarcerated, S. P. did not ask to see the mother but *did* ask to see the driver/supervisor. According to the psychologist, S. P. "just sees [the mother] as a friendly person she knows who she has fun with when she's with her but not in the caregiver capacity." The psychologist testified that S. P. was insecure after unsupervised visits with the mother and told the psychologist "that [the mother] was telling her she was going to live with her forever, and she didn't want to live with her forever." Her foster mother gave similar testimony, that after visits with the mother S. P. acted out and became clingy.

The juvenile court also received reports from a guardian ad litem and a court appointed special advocate, who both recommended that the court terminate the mother's parental rights. The court found that S. P. was a dependent child, that termination of parental rights and adoption were in her best interest, and that the grandmother could not provide S. P. a safe, stable, and permanent home, specifically citing the grandmother's difficult and unhealthy relationship with the mother and stating that it was clear to the court that "the mental health disorders of the mother are [a] direct reflection of her lifelong environment [with the grandmother]."

14

On January 27, 2015, the juvenile court entered an order granting the grandmother's motion to intervene but denying the petition to appoint her S. P.'s permanent guardian. Also on that date, the juvenile court granted the petition to terminate the mother's parental rights. The trial court found, as detailed below, that the statutory ground for termination set forth in OCGA § 15-11-310 (a) (5) had been met and that termination was in S. P.'s best interest as required by OCGA § 15-11-310 (b). In the termination order, the juvenile court awarded permanent custody of S. P. to DFCS to be placed for adoption. The mother appeals from both rulings.

2. *Termination of parental rights (Case No. A15A2016).*

Like the former Juvenile Code, Georgia's new Juvenile Code provides for a two-step process that must be followed in determining whether to terminate parental rights. OCGA § 15-11-301 (a) requires that the juvenile court "first determine whether one of [several specified] statutory grounds for termination of parental rights has been met[.]" The statutory ground pertinent to this appeal provides:

> A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

15

OCGA § 15-11-301 (a) (5). "If any of the statutory grounds for termination has been met, the [juvenile] court shall then consider whether termination is in a child's best interest[ ] after considering [several specified] factors[.]" OCGA § 15-11-301 (b). "In all proceedings under this article, the standard of proof to be adduced to terminate parental rights shall be by clear and convincing evidence." OCGA § 15-11-303.

The mother argues that there was not clear and convincing evidence of the following factors: that S. P. was presently dependent, that the dependency was likely to continue, that the dependency was likely to harm S. P., and that termination of parental rights was in S. P.'s best interest. We disagree.

(a) *Present dependency caused by lack of proper parental care or control.*

The juvenile court found that S. P. was a dependent child due to lack of proper parental care or control by the mother. The new Juvenile Code defines a dependent child as "a child who . . . [h]as been abused or neglected and is in need of the protection of the court[;] . . . [h]as been placed for care or adoption in violation of law; or . . . [i]s without his or her parent, guardian, or legal custodian." OCGA § 15-11-2 (22). This definition is similar although not identical to the definition of a deprived child under our former Juvenile Code. See former OCGA § 15-11-2 (8). Likewise, both the new and former Codes set forth similar but not identical

16

considerations for the juvenile court to determine whether a child is without proper parental care and control. See OCGA § 15-11-311; former OCGA § 15-11-94 (b) (4) (B), (C). Many of the principles expressed in decisions under our former Code are helpful in determining whether dependency has been shown for purposes of terminating parental rights.

The mother argues that there was not clear and convincing evidence of S. P.'s present dependency. See *In the Interest of M. T. F.*, 318 Ga. App. 135, 145 (1) (733 SE2d 432) (2012) ("DFCS was required to present at the termination hearing evidence of *present* deprivation, not past or potential future deprivation") (citations omitted; emphasis in original). The juvenile court's termination order makes clear, however, that the dependency finding was based on present, not past, unfitness on the part of the mother – the mother's ongoing and unaddressed psychological conditions, her inconsistent commitment to her own therapy and to joint therapy and visitation with S. P., her continuing criminal infractions (including pending drug-related offenses for which she was incarcerated at the time of one of the termination hearings), her continued inability to set boundaries with and become independent of the grandmother, the continued lack of stability in her life (including employment and

17

housing) as a result of her repeated incarcerations, her failure to pay her child support obligation, and her continued inability to establish a parental bond with S. P.

In earlier orders, the juvenile court had adjudicated S. P. deprived and dependent for many of these same grounds. In January 2014, for example, the juvenile court adjudicated S. P. dependent on the grounds that the mother "continue[d] to need to address her psychological diagnosis; need[ed] to continue to address an ability to appropriately parent; [and] need[ed] to establish continued stability." The mother, who was represented by counsel, consented to this ruling "that the child remained dependent as to her, as she needed to maintain stability and remain in counseling to address her mental health needs." Because the mother did not challenge the earlier rulings on appeal, she cannot now challenge a conclusion that those grounds constituted deprivation or dependency at the time of those rulings. See *In the Interest of P. D. W.*, 296 Ga. App. 189, 192 (1) (a) (674 SE2d 338) (2009) (unappealed order adjudicating child deprived binds parent to finding that at time of order child was deprived for reasons given therein). Since the earlier rulings, the mother's circumstances have gotten worse, not better, and many of the grounds of deprivation or dependency identified in the earlier rulings persist. The evidence authorized the juvenile court to find that S. P. was presently deprived.

18

The mother also argues that the juvenile court improperly based her dependency finding on the mother's poverty and mental disability, citing our statement in *In the Interest of S. R. R.*, 330 Ga. App. 817, 821-822 (769 SE2d 562) (2015), that we "will not sustain the termination of a mother's right to raise her child, based on either her poverty or her physical disabilities, when neither renders her incapable of caring for her child." (Citation omitted.) We do not discern from the juvenile court's order that she found poverty to be at the root of the mother's failure to complete her case plan or any other cause of S. P.'s dependency; rather, the juvenile court found that the mother did not meet her case plan goals because of her inability or unwillingness to address her psychological issues and refrain from committing criminal acts. See *In the Interest of B. A. S.*, 254 Ga. App. 430, 435-436 (3) (563 SE2d 141) (2002) (incarcerated parent's history of repeated incarcerations for commission of criminal offenses was factor that juvenile court could consider in determining whether child was presently without proper parental care and control). And unlike the evidence in *In the Interest of S. R. R.*, here there was evidence that the mother's psychological conditions were harmful to S. P. and otherwise rendered the mother incapable of caring for the child. The juvenile court's findings as to present dependency were not clearly erroneous.

19

(b) *Likelihood of dependency to continue.*

The juvenile court found that the cause of S. P.'s dependency was likely to continue and not likely to be remedied, satisfying one of the factors set forth in OCGA § 15-11-310 (a) (5). Our former Juvenile Code contained a similar factor, see former OCGA § 15-11-94 (b) (4) (A) (iii), and accordingly we will look to cases interpreting our former Code for guidance.

Again, the mother argues that the evidence demonstrated past, not present, unfitness. While "evidence of past unfitness, *standing alone*, is insufficient to terminate the rights of a parent in her natural child," *In the Interest of D. D. B.*, 282 Ga. App. 416, 418 (1) (638 SE2d 843) (2006) (citation and punctuation omitted; emphasis supplied), the juvenile court was permitted to consider evidence of the mother's past conduct in determining whether the dependency was likely to continue. *In the Interest of M. L.*, 290 Ga. App. 437, 441 (3) (659 SE2d 800) (2008); *In the Interest of C. R. G.*, 272 Ga. App. 161, 164 (611 SE2d 784) (2005). And as discussed above, evidence of the mother's present unfitness was presented to the juvenile court.

The mother also points to evidence of her attempts to form a bond with S. P. and address her psychological issues as grounds for reversing the juvenile court's judgment. Despite the mother's sporadic efforts, however, the evidence authorized

20

the juvenile court to find that she had not been able to establish a parental bond with S. P., and that her recurring incarcerations and unwillingness or inability to follow the recommendations of S. P.'s psychologist contributed to this problem. The lack of such a bond supports a finding of continued dependency. *In the Interest of D. D. B.*, 282 Ga. App. at 419 (1) (citations omitted). Several expert witnesses also testified that the mother had a low likelihood of resolving her psychological issues and the accompanying pattern of instability and incarceration. Evidence of the mother's failure to resolve her psychological issues and evidence of her history of incarceration for repeated offenses supported the juvenile court's finding that dependency was likely to continue. See *In the Interest of O. M. J.*, 297 Ga. App. 20, 27 (2) (b) (676 SE2d 421) (2009); *In the Interest of P. A. T. L.*, 264 Ga. App. 901, 903 (1) (592 SE2d 536) (2003).

The mother's decision, during the course of the termination proceedings, to enter a rehabilitation program as a bond condition may reflect a renewed commitment toward addressing the issues that have manifested in her criminal acts and other unhealthy behaviors. But "recent improvements do not establish that the parent is capable of maintaining the progress." *In the Interest of M. L.*, 290 Ga. App. at 441 (3) (citation and punctuation omitted). "In considering a parent's claims of recent

21

improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." *In the Interest of D. D. B.*, 282 Ga. App. at 419 (1) (citation and punctuation omitted). See also *In the Interest of N. M. H.*, 252 Ga. App. 353, 356 (556 SE2d 454) (2001) (it was for the juvenile court to judge the credibility of the mother's contention that "she is now willing to take steps to be a proper parent"). "Based upon the record, there was sufficient clear and convincing evidence to support a finding that the mother's inability or unwillingness to resolve the problems which have caused [S. P.'s dependency] is likely to continue and will not be remedied." *In the Interest of D. L. T.*, 283 Ga. App. 223, 228 (1) (641 SE2d 236) (2007) (citations omitted). See *In the Interest of K. A. C.*, 290 Ga. App. 310, 313 (3) (659 SE2d 703) (2008) ("The evidence authorized a finding that the mother's past actions [and patterns] would likely continue and cause [S. P's dependency].") (citation omitted); *In the Interest of G. L. H.*, 209 Ga. App. 146, 150 (2) (433 SE2d 357) (1993) (under former Juvenile Code, court may consider parent's failure to participate in court-ordered mental health counseling when determining whether the child's deprivation is likely to continue or will not be remedied).

(c) *Harm caused by dependency.*

The juvenile court found that S. P.'s continued dependency would cause or was likely to cause her serious physical, mental, emotional, or moral harm, as required by OCGA § 15-11-310 (a) (5). Our former Juvenile Code contained a similar factor, see former OCGA § 15-11-94 (b) (4) (A) (iv), and accordingly we will look to cases interpreting our former Code for guidance.

As the mother correctly notes, a "mother's inability to care for her children does not necessarily mean that her current relationship with them is detrimental." *In the Interest of J. S. B.*, 277 Ga. App. 660, 663 (2) (d) (627 SE2d 402) (2006) (citations and punctuation omitted). She also criticizes the juvenile court's consideration of S. P.'s need for permanence in determining that she was likely to be harmed by continued dependency. Pretermitting whether, under the new Juvenile Code, a child's need for permanence remains a factor in determining whether the child is likely to be harmed by continued dependency, as well as a factor in determining the child's best interest, see OCGA § 15-11-310 (b) (3) (identifying a child's need for permanence among the factors for the juvenile court to consider in determining whether termination is in the child's best interest), the evidence in this case supported the juvenile court's finding that S. P.'s continued dependency was likely to harm her.

23

Evidence supporting the juvenile court's finding included expert testimony that S. P. needed the type of stability and consistency provided by her foster family to thrive; expert testimony that the mother was unlikely to resolve the psychological issues that resulted in her pattern of incarceration and prevented her from developing a parental bond with the girl and providing stability to her; evidence that the mother's failure to follow the recommendations of S. P.'s psychologist during their joint therapy and visitation confused and upset the girl; and evidence that during unsupervised visits, the mother caused S. P. significant distress by telling her that she might leave her foster family and return to live with the mother. This evidence of the impact upon S. P. of the mother's recurring psychological problems and repeated incarcerations, and her admitted inability to manage her own life, supported the juvenile court's determination. See *In the Interest of A. K.*, 272 Ga. App. 429, 438 (1) (d) (612 SE2d 581) (2005).

> While it is not automatically true that a finding that [dependency] is likely to continue will support a finding that continued deprivation will harm the child, in this case the trial court was authorized to conclude that the mother's inconsistent efforts in the past to stay [out of jail], lead a stable life, [address her mental health needs], and [follow the recommendations of S. P.'s psychologist] so that she could develop a bond with her had caused the child to suffer emotional difficulties[.] . .

. The evidence also showed that [S. P.] had overcome many of her problems while in foster care and that although she had no bond with her mother she had bonded with her foster parent[s] who desired to adopt her. We have previously held that where evidence shows no parental bond between parent and child, the child has adapted well to foster care, and the foster parents wish to adopt, this is sufficient to support the conclusion that continued [dependency] is likely to harm the child.

*In the Interest of D. D. B.*, 282 Ga. App. at 419-420 (1) (citations and punctuation omitted). See *In the Interest of P. A. T. L.*, 264 Ga. App. at 904 (1) (finding clear and convincing evidence that child was likely to be seriously harmed by continued deprivation where mother had repeated criminal convictions and incarcerations, had failed to comply with her reunification case plans, and had failed to establish a parental bond with her child); *In the Interest of M. J. G.*, 288 Ga. App. 754, 756 (655 SE2d 333) (2007) (evidence supporting termination of parental rights included testimony from child's evaluating psychologist that child "could not tolerate being abandoned again"). Cf. *In the Interest of N. T.*, 334 Ga. App. 732, 744 (4) (780 SE2d 416) (2015) (speculation that child might be upset and begin acting out if he learned of possibility of being removed from foster care was not evidence that parent's present relationship with child was harmful).

(d) *Best interest.*

The juvenile court found that termination of the mother's parental rights was in S. P.'s best interest, citing the girl's needs for permanence, her expressed desire to interact with and be a part of her foster family, the juvenile court's determinations that S. P. would be harmed if removed from her current placement and that the grandmother would not be an appropriate caregiver for the girl, and the recommendations of both the guardian ad litem and court appointed special advocate in favor of termination. The new Juvenile Code requires a juvenile court to consider the following factors in determining whether termination is in a child's best interest:

> (1) Such child's sense of attachments, including his or her sense of security and familiarity, and the continuity of affection for such child;
>
> (2) Such child's wishes and long-term goals;
>
> (3) Such child's need for permanence, including his or her need for stability and continuity of relationships with a parent, siblings, and other relatives; and
>
> (4) Any other factors, including the factors set forth in Code Section 15-11-26, considered by the court to be relevant and proper to its determination.

OCGA § 15-11-310 (b). This Code Section is more specific than former OCGA § 15-11-94 (a), which provided that the juvenile court in its best interest analysis consider "the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home." Nevertheless, decisions under our former Code are instructive.

The mother's argument that the juvenile court erred in her best interest determination rests on the mother's contention that the evidence showed she had a bond with S. P. and was making progress on her case plan. The juvenile court, however, construed the evidence otherwise, and she was authorized to consider S. P.'s need for permanence and emotional stability in making the best interest determination. See *In the Interest of B. J. F.*, 276 Ga. App. 437, 443 (2) (623 SE2d 547) (2005). "After reviewing the record and giving the [juvenile] court's findings of fact the required deference, we cannot conclude that these factual findings are clearly erroneous." *Strickland*, __ Ga. at __ (1) (citation omitted).

3. *Award of custody of S. P. to DFCS to be placed for adoption (Case No. A15A2016).*

In the termination order, the juvenile court awarded custody of S. P. to DFCS to be placed for adoption, finding the placement to be in the girl's best interest. The

27

juvenile court stated that, in making this placement, she considered the factors set forth in OCGA § 15-11-321, which include "[t]he value of biological and familial connections[.]" OCGA § 15-11-321 (a) (4). The juvenile court stated that, while she "recognizes the value of biological family, [she] finds that [S. P.] would be harmed if moved from her current placement" and that she "does not find that there are any biological relatives that are appropriate."

The mother argues that the evidence compelled the juvenile court to reach a different conclusion and to place S. P. with the grandmother. She challenges the juvenile court's finding that the relationship between the grandmother and mother was unhealthy, asserting that the juvenile court should not have credited the mother's own statements about that relationship or construed from the evidence that the relationship between the mother and grandmother would put S. P. at risk. "We will not disturb a trial court's determination that placement with a relative is not in the best interest of the child absent an abuse of discretion[.]" *In the Interest of A. L. S. S.*, 264 Ga. App. 318, 324 (2) (590 SE2d 763) (2003) (citation omitted). Given the evidence recounted above, we find no abuse of discretion here.

4. *Permanent guardianship (Case No. A15A2015).*

28

In her enumerations of error, the mother offers two arguments for why the juvenile court erred in declining to appoint the grandmother as S. P.'s permanent guardian: because there was evidence of the grandmother's suitability as a guardian that compelled the juvenile court to grant the petition; and because there was not evidence that DFCS had made reasonable efforts to place S. P. with a relative. Both arguments essentially challenge the sufficiency of the evidence to support the juvenile court's determination not to appoint the grandmother as permanent guardian.

The new Juvenile Code vests the juvenile court with jurisdiction to appoint a permanent guardian for a child adjudicated as a dependent child. OCGA § 15-11-240 (a). To appoint the grandmother as S. P.'s permanent guardian, OCGA § 15-11-240 (a) (2) required the juvenile court to find that termination of parental rights and adoption was not in the girl's best interest. As discussed above, the evidence authorized the juvenile court's contrary finding, that the termination of the mother's parental rights and the award of the girl's permanent custody to DFCS to place for adoption *were* in S. P.'s best interest. Accordingly, we find no merit in the mother's challenge to the sufficiency of the evidence supporting the juvenile court's denial of the permanent guardianship appointment.

5. *Unenumerated error (Case No. A15A2015).*

In addition, the mother states in the argument section of her appellate brief that the juvenile court erred by not requiring her and the grandmother "to waive any potential conflict from having [the same counsel] represent both of them." She did not enumerate this as error, however, and she cannot expand her enumeration of error through her brief. See *Veolia Environmental Servs. v. Vick*, 309 Ga. App. 658, 660 (2) (711 SE2d 40) (2011).

*Judgments affirmed. Ellington, P. J., concurs and Dillard, J., concurs in the judgment only.*

A15A2015, A15A2016. IN THE INTEREST OF S.P., a child.

DILLARD, Judge, concurring in judgment only.

I concur in judgment only because I do not agree with all that is said in the majority opinion. As a result, the majority's opinion decides only the issues presented in the case *sub judice* and may not be cited as binding precedent. See Court of Appeals Rule 33 (a).